

# NUMBER 13-24-00196-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

**DION JONES**
**A/K/A DION CORTEZ JONES,**                                                    **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                                              **Appellee.**

---

## ON APPEAL FROM THE 211TH DISTRICT COURT
## OF DENTON COUNTY, TEXAS

---

## MEMORANDUM OPINION

**Before Chief Justice Tijerina and Justices West and Fonseca**
**Memorandum Opinion by Justice Fonseca**

Appellant Dion Jones a/k/a Dion Cortez Jones was convicted of murder, a first-degree felony, and was sentenced to life imprisonment. *See* TEX. PENAL CODE ANN. § 19.02. On appeal, he contends by one issue that the trial court erred by admitting testimony regarding autopsy results by a physician who did not perform the autopsy. We

affirm.[1]

# I.  BACKGROUND

Trial testimony established that police received a report of an unconscious person at an apartment in Lewisville on March 18, 2022. When they arrived, they found Aiyah Roseborough deceased on the floor of the apartment, with a white phone charging cord "wrapped around her throat" and a "ligature mark" consistent with the cord on her neck. Officers noted there were "a bunch of scuff marks" on the wall near where Roseborough was found, and it appeared as if the marks had "pieces of her hair" in them.

Brendalyn Duplessis testified that Roseborough was her friend since childhood, and she knew Jones because he was in a relationship with Roseborough and often stayed over at her apartment. On March 18, 2022, Duplessis tried calling Roseborough but received no answer, which was unusual. Instead, Duplessis received texts from Roseborough's phone stating, "Just text me." Duplessis then texted Jones to inquire about Roseborough's whereabouts. Jones replied that he and Roseborough had gotten into an argument and that "she left and she [turned] her phone off." That evening, Duplessis went to Roseborough's apartment, and she found the door unlocked. She discovered her friend's dead body and called 911. Roseborough was twenty-four years old and had a one-year-old son at the time of her death.

Duplessis testified that Jones began texting her again about an hour after officers arrived, while she was sitting in a police car talking to a detective. The text exchanges were entered into evidence. In one of them, Jones said that Roseborough turned her

---

[1] This appeal was transferred from the Second Court of Appeals in Fort Worth pursuant to an order issued by the Texas Supreme Court. *See* TEX. GOV'T CODE ANN. § 73.001. We are required to follow the precedent of the transferor court to the extent it differs from our own. TEX. R. APP. P. 41.3.

phone off because of "some s[***] I did to her." Later, he texted Duplessis: "Aiyah dead bro. . . . She tried to stab me. . . . She seen some s[***] in my phone. Somebody texted me this morning and she had my phone at work. She blew it out of proportion."

Subsequently, at the direction of the detective, Duplessis texted Jones that Roseborough was hurt but was still alive. Jones replied: "You just lifted the biggest weight o[ff] my shoulder. I thought I killed her." Duplessis then told Jones that Roseborough was in a room with paramedics, that she was refusing to go to the hospital, and that she had told police that "she fell and hit her head." Duplessis then began sending texts to Jones pretending to be Roseborough. At one point, Jones asked, "You hear what I told you before you blacked out?" He also asked, "Why you ain't tell on me[?]"

Kapri Thompson testified that she was previously in a romantic relationship with Jones, that they remained friends, and that she hung out with Jones and Roseborough on March 17, 2022. The next day, Thompson went to Roseborough's apartment, and Jones was there. Jones was complaining about having lost his phone, and so he used Thompson's phone to call Roseborough. According to Thompson, Jones and Roseborough engaged in a "heated argument" over the phone and via text. Thompson could not hear the details of the conversation but gathered that Roseborough wanted Jones to leave the apartment.

Later, Thompson and Jones went to Thompson's apartment, and Roseborough stopped by there to drop off Jones's phone. Jones left Thompson's apartment that afternoon, and when he came back around 8:00 p.m., he told Thompson that he and Roseborough got into an argument which "got a little physical." Later in the evening, Thompson and Jones went to Jones's mother's house, and on the way, they drove past

3

Roseborough's apartment, where a police car was stationed outside the gate. Thompson said Jones did not ask the officer what happened but rather made a U-turn.

Thompson testified that, while she and Jones were drinking together on March 19, 2022, she asked him about what happened with Roseborough. According to Thompson, Jones reported that he had grabbed Roseborough "by the arm trying to calm her down," but Roseborough "grabbed a knife" and tried to stab him, so he "choked her out."

Based on the text messages, police identified Jones as a suspect. Detective Jeff Carey of the Lewisville Police Department interviewed Jones in jail after his arrest on March 20, 2022.[2] According to Carey, Jones stated he and Roseborough were in an argument, that she threatened him with a knife,[3] and that

> he choked her with his hands. And after he was done choking her with [his] hands, she kept making noise. And because . . . she kept making noise, he took the cord, wrapped it around her neck, and—until she wasn't making any noise again. Then he kissed her on her forehead and left.

Jones testified in his own defense. He stated that, on the morning of March 18, 2022, Roseborough discovered that a woman had sent nude photos of herself to Jones's cell phone, and she demanded that he leave her apartment. Jones then "bagged up all of [Roseborough's] stuff" because he was "mad, upset, being petty." According to Jones, he left the apartment but returned later in the day, at which point Roseborough "punched" and slapped him and screamed obscenities at him. Jones said he "turned to leave" when he saw "she was lunging at [him] with a knife." He testified:

> I'm just trying to evade, because she didn't come for my face. She was

---

[2] Carey testified that he administered *Miranda* warnings to Jones and that Jones voluntarily waived his rights. A video recording of the interview was entered into evidence, and portions of it were played for the jury.

[3] Jones told officers where the knife was located, and they returned to the scene and collected it as evidence. A forensic scientist testified that a partial DNA profile was retrieved from the knife, and that neither Jones nor Roseborough could be excluded as possible contributors to the profile.

4

trying to get me in my body. And I was like, Okay. And she came at me this time, but for my face. When she came for my face, I didn't sidestep. I stood there, but I weaved. And she came back the next time. I ducked, and I grabbed her by—I grabbed her by her neck and dropped her with my leg and took her to the ground and I choked her. . . . I choked her with both of my hands forward on top of her.

. . . .

The knife is still in her hand. . . . . She tried to hit me with the knife. How I was positioned over her, I just threw my shoulder up. Her . . . forearm hit my shoulder. The knife came right across my face both times, and . . . I applied more pressure. I'm not going to lie. I applied more pressure, and all I told her was to drop the knife, drop the knife, drop the knife, drop the knife. And I'm not—[in] my mind, I'm not letting go until she drops that knife.

Jones said Roseborough then "passed out" and dropped the knife; however, she "came to" shortly thereafter, "regained possession" of the knife, and lunged at him again. He stated:

I grabbed the phone cord. And when she swung at me—I had already had in my mind, if she swing at me, she has one swing. And she swung it and I ducked under her and I wrapped the cord around her neck and I threw her to the ground. Like, we both flew to the ground. . . . I pulled with the cord, took her to the ground.

Jones said that Roseborough continued to act like she was trying to stab him, so he "pulled harder" and demanded that she drop the knife. Eventually, she stopped moving, and Jones took the knife from her hands and put it away.

Jones testified that, when Roseborough "tried to stab [him] in the face," he became afraid that he would be seriously injured or killed. He said he did not call 911 because he feared that he would be blamed "[r]egardless of if I was defending myself or not."

The jury was instructed on the justifications of self-defense and deadly force in defense of a person. *See* TEX. PENAL CODE ANN. § 9.31(a) (providing generally that "a person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the

5

other's use or attempted use of unlawful force"); *id.* § 9.32(a) ("A person is justified in using deadly force against another: (1) if the actor would be justified in using force against the other under [§] 9.31; and (2) when and to the degree the actor reasonably believes the deadly force is immediately necessary . . . to protect the actor against the other's use or attempted use of unlawful deadly force"). It found Jones guilty of murder and assessed punishment at life imprisonment. This appeal followed.

## II.   DISCUSSION

By a single issue on appeal, Jones argues it was error to admit the testimony of Steven Hemberger, M.D., regarding the results of an autopsy performed by the Tarrant County Medical Examiner's Office "when he was not employed with the office at the time of the autopsy."

## A.   Standard of Review and Applicable law

"We review a trial court's ruling on the admissibility of evidence under an abuse of discretion standard, and we must uphold the trial court's ruling if it was within the zone of reasonable disagreement." *Wells v. State*, 611 S.W.3d 396, 427 (Tex. Crim. App. 2020).

The Confrontation Clause, applicable to the states via the Fourteenth Amendment, guarantees an accused the right to confront and cross-examine adverse witnesses. U.S. CONST. amends. VI, XIV; *Vinson v. State*, 252 S.W.3d 336, 338 (Tex. Crim. App. 2008); *Clark v. State*, 282 S.W.3d 924, 930 (Tex. App.—San Antonio 2009, pet. ref'd). A statement offered against a defendant may implicate the Confrontation Clause even when it is admissible under evidentiary rules. *Clark*, 282 S.W.3d at 930. An out-of-court statement implicates the Confrontation Clause whenever it is: (1) made by a witness who is absent from trial and (2) testimonial in nature. *Woodall v. State*, 336 S.W.3d 634, 642

6

(Tex. Crim. App. 2011). A statement is testimonial if "the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Davis v. Washington*, 547 U.S. 813, 822 (2006). Whether a statement is testimonial is judged "by the standard of an objectively reasonable declarant standing in the shoes of the actual declarant." *Wall v. State*, 184 S.W.3d 730, 742–43 (Tex. Crim. App. 2006) (citing *Crawford v. Washington*, 541 U.S. 36, 52 (2004)). Because trial courts are no better equipped to apply this standard than appellate courts, we review whether a statement is testimonial de novo. *Id.*

"For an expert's testimony based upon forensic analysis performed solely by a non-testifying analyst to be admissible, the testifying expert must testify about his or her own opinions and conclusions." *Paredes v. State*, 462 S.W.3d 510, 517–18 (Tex. Crim. App. 2015). "While the testifying expert can rely upon information from a non-testifying analyst, the testifying expert cannot act as a surrogate to introduce that information." *Id.* (concluding, where the testifying expert referred to results of DNA tests performed by non-testifying analysts, that the expert's testimony was nevertheless admissible under the Confrontation Clause because she "performed the crucial analysis determining the DNA match and testified to her own conclusions"); *see Bullcoming v. New Mexico*, 564 U.S. 647, 661–62 (2011) (noting that "surrogate [expert] testimony" violated the Confrontation Clause because it "could not convey what [the non-testifying analyst] knew or observed about the events his certification concerned" nor could it "expose any lapses or lies on the [non-testifying] analyst's part"); *see also Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 329 (2009) ("The Sixth Amendment does not permit the prosecution to prove its case via *ex parte* out-of-court affidavits . . . .").

**B.** **Analysis**

Hemberger, a forensic pathologist, testified that he began working as a deputy medical examiner at the Tarrant County Medical Examiner's Office in 2023. He said he reviewed Roseborough's autopsy, which was performed by Sam Andrews, M.D., who no longer works with the medical examiner's office, and with whom Hemberger was unacquainted.

When asked what injuries he observed from the autopsy photos, Hemberger testified he noticed a "ligature" as well as abrasions and hemorrhaging on her neck; petechiae on her face, eyelids, and mouth lining; a contusion on her tongue; and abrasions on her hands. He said the presence of petechiae indicates that "there was some type of compressive force preventing the blood to recirculate," and he agreed that it was consistent with strangulation. Hemberger also stated that Roseborough's "brain was edematous or swollen, and that can be a sign from anoxic brain injury, meaning that they're not getting any oxygen to the brain and it swells up." Over defense counsel's Confrontation Clause objection, Hemberger opined that the manner of death was homicide, and the cause of death was strangulation.

On appeal, Jones argues that Hemberger's testimony regarding the cause and manner of death was inadmissible under the Confrontation Clause because (1) the State did not establish that Andrews was unable to testify, and (2) the defense had no opportunity to cross-examine Andrews. Citing *Lee v. State*, 418 S.W.3d 892, 899 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd), and *Wood v. State*, 299 S.W.3d 200, 209 (Tex. App.—Austin 2009, pet. ref'd), Jones contends that the admission of Hemberger's testimony was a "back[]door[ ]way to enter the autopsy report of [Andrews] without

8

entering the actual document."

We disagree. The cases cited by Jones—both of which involve testimony regarding autopsy results by a physician other than the one who performed the autopsy—are instructive. In *Wood,* the court held that, to the extent the testifying physician expressed his "own opinions regarding the nature and causes" of the death, that did not offend the Confrontation Clause "even though those opinions were based in part on [his] review of [the examining physician's] autopsy report." 299 S.W.3d at 213 (noting that, "[w]hen an expert bases an opinion on testimonial hearsay but does not disclose the testimonial hearsay on which that opinion is based, the jury hears only the expert's direct, in-court testimony"). In that case, however, the testifying expert "did more than merely offer his expert opinions[; h]e also disclosed to the jury the testimonial statements in the autopsy report on which his opinions were based." *Id.* The court held the admission of those "testimonial statements" violated appellant's right to confront the examining physician, though it also held the error was harmless. *Id.* at 214–15. The *Lee* court similarly held that, though the testifying physician's "conclusions based on [his] independent examination of the autopsy photographs" were admissible, the provision of "the [autopsy] report itself" to the jury violated the Confrontation Clause. 418 S.W.3d at 899; *see Paredes*, 462 S.W.3d at 517 ("The admission of a lab report created solely by a non-testifying analyst, without calling that analyst to sponsor it, violates the Confrontation Clause.").

Here, Hemberger reviewed Andrews's autopsy report, including photographs, but he did not testify as to any statements made in the report, testimonial or otherwise, and the report itself was never entered into evidence or provided to the jury. The transferor

9

court has held in a very similar case that a non-examining physician's opinions regarding the manner and cause of death, based on his review of an autopsy he did not perform, did not implicate the Confrontation Clause. *Williams v. State*, 513 S.W.3d 619, 637–38 (Tex. App.—Fort Worth 2016, pet. ref'd) (noting that the non-examining physician's "testimony was based on his own observations, conclusions, and expertise" and that "autopsy photographs are nontestimonial in nature for confrontation purposes"). Jones offers no reason to deviate from *Williams*; therefore, we conclude there was no Confrontation Clause violation in this case. *See id.*

As the State notes, Jones also does not offer any cogent argument for how the admission of the challenged testimony harmed him. *See* TEX. R. APP. P. 38.1(i). Even if we were to find that the trial court committed constitutional error by denying Jones's objection, he would not be entitled to reversal because the error did not contribute to his conviction or punishment. *See* TEX. R. APP. P. 44.2(b). Jones baldly claims, without reference to authority or the record and without elaboration, that "[t]he statements from [Hemberger] are essential to the State's case." But the cause and manner of Roseborough's death were not disputed in this case. The evidence—including the testimony of the responding officers, Duplessis, Thompson, and Jones himself— unanimously established that the death was caused by strangulation and was intentional. The only genuine dispute at trial was whether Jones was justified in causing the death under a self-defense theory. The jury rejected that theory, and there is no reason to think that it would have reached a different conclusion had Hemberger not testified as to the manner and cause of Roseborough's death. We conclude beyond a reasonable doubt that the admission of the challenged testimony did not contribute to Jones's conviction or

punishment. *See id.* Jones's issue on appeal is overruled.

### III. CONCLUSION

We affirm the trial court's judgment.

YSMAEL D. FONSECA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
10th day of July, 2025.